James Gibson, J.
This case was tried on September 4, 5, 6
and 9, 1974 and was finally submitted (CPLR 4213, subd [c]) on April 5, 1975 with the filing of respondent’s additional memorandum.
The proceeding is brought under CPLR article 78 for judgment directing respondent to approve and otherwise effectuate petitioner’s application for approval and financing of a sewer project'.
The county sewer district, on whose behalf suit is brought, planned a comprehensive sewage treatment and collection system to be constructed in three stages over a period of years. Stages I and II, designed to. serve 100,000 people, involved the construction by the district, with State and Federal assistance, of treatment plants and interceptor sewers, which were completed in 1969 at a cost of $36.5 million, while the Towns of Ramapo and Clarkstown constructed collecting or lateral sewers at a cost of approximately $50 million.
Stage III, as previously projected, was approved by the County Legislature on September 21, 1970. This, the final stage, was designed to increase the plant capacity and the number of interceptors so as to serve an additional 65,000 people and was estimated to cost $30 million. On March 29, 1971, petitioner’s formal application for State and Federal aid was filed and given a project number. This project originally contemplated construction by local funds (40%), augmented by State assistance (30%) and Federal assistance (30%) under amendments (L. 1965, ch 177) to section 1263-b of the Public Health Law (now Environmental Conservation Law, § 17-1903). By the terms of the act, assistance thereunder was limited to approved projects upon which construction should be commenced no later than March 31, 1972. Mindful of this deadline, the district timely began (and subsequently completed) certain construction entirely funded by it, pursuant to contracts aggregating approximately $2.36 million.
Fundamental to petitioner’s case, of course, is the necessity of proof that the project was approved by respondent. Until. that step should be accomplished, no application for State and *949 Federal assistance could be concluded and no obligation on the part of respondent — contractual or otherwise — could arise. Respondent contends that no approval was ever given. Petitioner asserts, on the contrary, that the requisite approval, sufficient to activate the funding applications, is to be found in the letter of October 14, 1971 addressed by Mr. Schlickenrieder, of respondent’s staff, to the executive director of petitioner’s district; but respondent asserts that the letter expressly conditioned the supposed approval upon the completion of a satisfactory infiltration report. In this fashion the primary, and perhaps the most critical, issue is posed.
Assuming, for the moment, that petitioner’s assertion of a subsisting, unconditional approval is correct, a second and equally formidable obstacle to recovery is then encountered, this in the fact of respondent’s so-called freeze, on January 20, 1972, of all pending applications, including that of petitioner’s district; but petitioner contends that respondent’s action was an illegal impoundment of supposedly available funds; a conclusion which respondent strenuously contests.
Upon respondent’s continued refusal to progress the application, the present petitioner’s predecessor on August 8, 1973 commenced an action against the present respondent’s predecessor[1] seeking declaratory judgment upon a number of issues and, further, demanding judgment that defendant be directed to approve the Stage III project, retroactive to January 20, 1972 (the freeze date), and to fund the State and Federal share of the costs from State bond moneys and from Federal moneys theretofore allegedly impounded by defendant. Defendant’s motion to dismiss the complaint for insufficiency was denied; and Special Term found that there had been raised issues as to whether defendant acted "in excess of his jurisdiction, in violation of law” and directed that the complaint be "converted” to a CPLR article 78 petition and be amended to comply with article 78 (sub nom. Murphy v Diamond, 78 Misc 2d 309, 311). Special Term denied defendant’s application for leave to appeal, as did an Associate Justice of the Appellate Division who, after noting Special Term’s direction that the case "be set down for trial of the issues of fact and law presented”, stated that: "A consideration of the issues of law raised by the affirmative defenses set forth in respondent’s answer and a determination of the sufficiency of the amended *950 petition in the face of these defenses can more expeditiously be made by Trial Term without prejudice to the interests of either party (see CPLR 409, subd [b]).”[2] (45 AD2d 772, 773).
The amended petition, served pursuant to Special Term’s direction, demands judgment that respondent perform affirmative acts, in six categories of action, including retroactive approval of the stage III project and effectuation of the funding thereof from State and Federal moneys. Thus, the proceeding sounds in mandamus, was so denominated in the petition and again in petitioner’s trial memorandum, and was tried and treated as such by counsel on both sides, although, as a practical matter, there was no restriction on the reception of any proof relevant to the basic problems, regardless of the form or category of the remedy.
That the approval of the application was within the judgment and discretion of respondent commissioner is so clear as to require no extended discussion (see Public Health Law, former § 1263-b, subd 1, par c [as constituted on the March 29, 1971 filing date], now Environmental Conservation Law, § 51-0303, subd 3, pars b, e). The question is, then, whether, as petitioner asserts, the commissioner’s letter of October 14, 1971 constituted approval. On its face, it did not; and there is nothing in the context of the then pending proceedings or in the surrounding circumstances disclosed by the record to modify that conclusion. The letter first stated that review of the report upon the stage III facility had been completed by respondent’s project evaluation section and was "acceptable contingent upon the following” (emphasis supplied) and the first of the conditions enumerated was that: "The results of the remedial program for the reduction of infiltration and other extraneous flows will be such that, at the completion of plant construction, average total flows will not exceed a per capita contribution of 100 gallons per day.” Expanding upon this, the letter stated that: "approval of final plans and the issuance of the construction permit will be contingent upon the satisfactory completion of a study identifying sources and *951 quantities of excess flows; and final aid payments will be linked to satisfactory evidence that substantial reductions in infiltration and other extraneous flows are effected prior to the completion of plant construction. Flow reductions to an average per capita contribution of 100 gallons per day or less will be considered as substantial.” (Emphasis supplied.) Finally, it was made clear that following transmittal of the report, "the next step in obtaining approval of the project” would be the submission of plans and specifications, application for approval thereof and other papers (emphasis supplied).
The problem was neither minor nor one readily susceptible of solution. A member of the firm of engineers retained by petitioner to report upon it testified that, following the completion of stages I and II, the problem of infiltration or inflow or both, into the county system, attributable to overloading and inefficiencies of the participating municipal sewer systems, was well known and remedial action was prevented because of the divided jurisdiction as between the county and the local units. Petitioner’s executive director, testifying on cross-examination, said that in 26 or 27 of the 28 days of February, 1971, the flow or gallonage going through the treatment plant exceeded its 10 million gallons per day capacity, that there was an overage each day in March, 1971, and that about the same rate of excess occurred in each month from the time the treatment plant was placed in operation to and including the date of the petition. Indeed, the continuous hydraulic overloading, due, in part at least, to overloads of 100% from one or more local systems of great age, such as those in Spring Valley and New Square, was proven by petitioner’s own witnesses. Petitioner’s contention that the terms of the contingent approval imposed nothing more than conditions subsequent, to be performed some time before the completion of the work, is unsupported argument and nothing more; and petitioner’s suggestion that, instead of studies, implemented by preventive measures and design, correction should await construction and further development of the evil, is plainly unacceptable.[3] Certainly, then, it was entirely rea *952 sonable for respondent to require that infiltration studies designed to correct these conditions be made and submitted for his approval.
The question becomes, then, whether petitioner did in fact develop and submit a study identifying sources and quantities of excess flows, before preparing plans and designs predicated on reduction of the excesses and corresponding reduction of the high plant capacity that would otherwise be necessary. Again, the answer is to be found in testimony adduced from petitioner’s executive director, and again the answer is directly contrary to petitioner’s argument and theory. The witness said that (prior to a formal study 18 months later) only a single report was rendered, this in February or March of 1972, covering "the entirety of a small village having about five miles of pipe in a total system of about 350 miles of pipe”. That this did not approach even substantial compliance is evident; and, indeed, it was not until April, 1973 — 18 months after respondent’s October 14, 1971 letter — that an infiltration study intended to comply with that letter was submitted. Importantly, this submission occurred some six months after the termination on October 18, 1972 of the freeze to which petitioner attributes the failure of its application and which is thus, in petitioner’s view, the crucial element in this litigation. The inexorable conclusion is that inasmuch as the October 14, 1971 conditions were not fulfilled — if at all — until long after the freeze had terminated, the freeze, whether legal or illegal, cannot be found to be the basis for an award of any relief in this proceeding.
The imposition, by the October 14, 1971 letter, of the conditions precedent to the submission of petitioner’s plans, specifications, application and other documents, as listed in the next to last paragraph of the letter, was plainly in the reasonable exercise of administrative discretion. Petitioner does not, and properly could not, dispute the administrator’s authority to exercise discretion; rather, petitioner contends that it was exercised to grant, rather than to condition, the application. That theory having now been held contrary to the facts and wholly untenable, and it having now been found that there was no compliance with the imposed conditions, it *953 is plain that those two holdings are dispositive of the litigation.[4] It is equally clear, although unnecessary to the decision, that the case is not one for mandamus, that is, to require performance of a nondiscretionary duty imposed by law. Finally, if it were possible and proper to treat the proceeding as brought to review an adverse determination — for such it is— as constituted by the letter of October 14, 1971, then it would have to be held, on the merits, that the determination was wholly reasonable and heither illegal nor arbitrary; but further, and in any event, the proceeding would be barred by the 60-day Statute of Limitations (Public Health Law, former § 1244, subd 1, now Environmental Conservation Law, § 17-0909, subd 2).
Petitioner’s remaining contentions have been examined and found equally unavailing; and none of them is such as to require discussion.
The respondent may have judgment dismissing the petition.

. See Murphy v Diamond (78 Misc 2d 309, mot. for lv. to app den 45 AD2d 772).

. Respondent’s assertion that this language confirms his contention that no issues of fact exist overlooks the obvious — which is that leave to appeal would have been granted had there been involved only issues of law erroneously determined at Special Term. Further, although it is true that the case turns largely on documentary proof, the critical documents in this case can best be construed in the light of the facts in respect of the surrounding circumstances. Accordingly, the oral motion for summary judgment of dismissal made at the opening of the trial was denied.

. No less a person than petitioner’s executive director testified that from a sound engineering point of view "it is important to know before the final plans and specifications are drawn where the problem lies” (and this the October 14, 1971 letter confirms) because, as the witness further testified, "if you can reduce the excessive infiltration and inflow, then you may not have to design for such a high capacity of the plant”; and petitioner’s engineer Fine readily agreed that the required study "was a condition precedent to project approval”. These concessions render unnecessary *952 more than passing reference to the Federal authorities’ flat statements that the study would have to be completed "as a prerequisite to the plant design” and "prior to favorable consideration * * * [of] the grant application” (Exhibit 5 attached to the answer and not controverted in petitioner’s reply).

. If, nevertheless, the court were to indulge the assumption, however unwarranted, that project approval was at some time and in some manner given, and, on the basis of that assumption take up petitioner’s contention that the State’s temporary withdrawal on January 20, 1972 of approval of all projects previously approved — the so-called freeze of State and Federal water pollution abatement funds — was illegal, as an unlawful impoundment of funds or for some other reason, the issue would have to be resolved against petitioner. A projected change in Federal procedures, threatening reimbursement of the State for its advances to communities by prefinancing anticipated Federal contributions, caused Commissioner Diamond to apply what he reasonably considered sound fiscal policy in thus temporarily suspending — for nine months as it eventuated — all pending applications. The grounds of his determination are well set out in petitioner’s exhibits Nos. 55 and 56 (marked for identification, and now annexed to petitioner’s brief and adverted to in both parties’ briefs), these being Commissioner Diamond’s letters, each dated January 20, 1972, to petitioner’s predecessor and to the Federal Regional Administrator. Further, there appears no parallel between this action and the presidential impoundment of appropriated Federal funds recently litigated in the Supreme Court of the United States (see Train v City of New York, 420 US 35; and Train v Campaign Clean Water, 420 US 136).